FILED

01/27/2017

Clerk of the
Appellate Courts



IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 14, 2016

## CHRISTOPHER EARL WATTS v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Davidson County**
**No. 2007-D-3224    Cheryl A. Blackburn, Judge**

_____

**No. M2016-00303-CCA-R3-PC**

_____

The petitioner, Christopher Earl Watts, appeals the denial of post-conviction relief from his convictions for aggravated child abuse and aggravated child neglect, for which he received an effective sentence of seventy-five years. On appeal, the petitioner argues trial counsel provided ineffective counsel by failing to fully explain the nature and consequences of waiving his right to testify, failing to call certain witnesses, and failing to file a motion in limine to exclude evidence regarding living in the "projects" and "on the streets." Due to the cumulative effect of this allegedly ineffective representation, the petitioner requests a new trial. Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and CAMILLE R. MCMULLEN, JJ., joined.

Laural Hemenway, Nashville, Tennessee, for the appellant, Christopher Earl Watts.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; Glenn Funk, District Attorney General; and Katrin Miller, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### *Facts and Procedural History*

**A.    Trial Proceedings and Direct Appeal**

According to our opinion following the petitioner's direct appeal, in April 2007, the petitioner was in a romantic relationship with Lakeisha Watkins. *State v. Christopher Earl Watts*, No. M2009-02570-CCA-R3-CD, 2012 WL 1591730, at *5 (Tenn. Crim. App. May 3, 2012). The petitioner lived with Ms. Watkins and the victim, Ms. Watkins' then fifteen-month-old child, in an apartment rented by Ms. Watkins. *Id.* The petitioner periodically babysat for the victim. *Id.* at *10.

On April 16, 2007, the petitioner babysat the victim while Ms. Watkins went to the dentist. *Id.* at *5. According to a statement later given by the petitioner to the police and played for the jury at trial, while babysitting, the petitioner brought the victim with him while he took the trash outside to the dumpsters. *Id.* The victim let go of the petitioner's finger, began running, and fell down a nearby hill. *Id.* The victim injured his lip, and a knot eventually appeared on his head. *Id.* The petitioner denied there were bruises on the victim's face. *Id.* The fall occurred around 11:00 a.m., but the petitioner and Ms. Watkins waited until 7:00 p.m. to take the victim to the hospital. *Id.*

Dr. Lawrence Stack, an emergency medicine physician at Vanderbilt Hospital, and a resident examined the victim on April 16, 2007. *Id.* at *6. The petitioner identified himself to the doctors as the victim's stepfather and said the victim fell "'flat on his face'" while he and the victim were walking down the hill to take out the trash. *Id.* The petitioner further reported that after falling, the victim slept for most of the day. *Id.* Dr. Stack noted the victim was fussy, unresponsive to attempts to open his eyes, and had multiple bruises on his forehead, face, upper arms, and shoulders. *Id.* Dr. Stack diagnosed the victim with a concussion and admitted him to the hospital so the Care Team, a consultation service responsible for evaluating children suspected of being abused, could evaluate his bruises and home environment. *Id.* at *6-7.

After being discharged from the hospital, the victim lived with Ms. Watkins' father for approximately three weeks. *Id.* at *3. The victim subsequently lived with Ms. Watkins' mother for another three weeks. *Id.* at *4. Eventually, Ms. Watkins asked if the victim could return to her home. *Id.* at *11. After a site visit from a case worker during which Ms. Watkins lied and said she was no longer in a relationship with the petitioner, the victim began living with Ms. Watkins and the petitioner again. *Id.*

The petitioner and Ms. Watkins continued to reside together in June 2007. *Id.* at *5. According to the petitioner's statement, the morning of June 13, 2007, the victim had a seizure while the petitioner changed his diaper. *Id.* at *5. It was hot in the apartment, so the petitioner thought the victim was having a heat stroke. *Id.* The petitioner put the victim in front of a fan, and the victim "'snapped out of it.'" *Id.*

Nicole Riley, the petitioner's cousin, testified that on the afternoon of June 13, 2007, the petitioner brought the victim to a birthday party at her house. *Id.* at *7. The victim "'just stood there'" and did not move, talk, or play. *Id.* Ms. Watkins later arrived, and the victim began to cry. *Id.*

According the petitioner's statement and Ms. Watkins' trial testimony, somebody named Michael spent the night in the apartment on June 14, 2007. *Id.* at *5, *12. The petitioner did not think Michael hurt the victim. *Id.* at *5. Ms. Watkins testified that Michael never had contact with the victim. *Id.* at *12.

The petitioner further indicated in his statement that on the morning of June 15, 2007, he woke up to find the victim had gotten out of his playpen, gone downstairs, and was "leaning on the couch." *Id.* at *5. At some point, the victim began screaming, and Ms. Watkins gave him Tylenol. *Id.* Later that day, Ms. Watkins fed the victim and exited the apartment, leaving the petitioner alone with the victim. *Id.* Shortly thereafter, the petitioner noticed the victim's lips were blue, and he appeared lifeless. *Id.* The petitioner ran outside and called for help. *Id.* The petitioner, who did not know how to perform cardio pulmonary resuscitation ("CPR"), blew into the victim's mouth and "'pressed'" on the victim. *Id.* A female neighbor then performed CPR on the victim, and he began to breathe. *Id.*

Ms. Watkins offered a slightly different version of the events occurring June 15, 2007. *Id.* at *11. According to Ms. Watkins' trial testimony, around 9:00 a.m., she heard the victim screaming and got out of bed to check on him. *Id.* The petitioner was holding the victim and told Ms. Watkins that he found the child downstairs, "'asleep standing up.'" *Id.* About five minutes later, the victim had a seizure that lasted five to ten minutes. *Id.* The petitioner did not want to call an ambulance, so she gave the victim Tylenol and let him sleep. *Id.* The victim remained weak and sleepy for the remainder of the day. *Id.*

Around 9:45 p.m., Ms. Watkins left the apartment to get something to eat while the petitioner watched the victim. *Id.* When she left, the victim appeared to be breathing normally. *Id.* When she returned about five minutes later, the victim was not breathing. *Id.* One neighbor performed CPR, while another called 911. *Id.*

Dr. Sandra Moutsios, a pediatrician and internist at Vanderbilt Hospital, testified at trial as an expert in pediatric medicine and child abuse. *Id.* at *7. According to Dr. Moutsios, after coming to the emergency room on June 15, 2007, the victim was treated for continuous seizures, stabilized, and admitted to the hospital. *Id.* Dr. Moutsios was part of the Care Team to subsequently evaluate the victim. *Id.*

Dr. Moutsios testified extensively about the injuries sustained by the victim and indicated "'it was his mental status that was most concerning.'" *Id.* Dr. Moutsios opined the victim sustained multiple injuries to his brain, one of which was acute and occurred within a couple days of June 15, 2007. *Id.* at *9. The other brain injuries were older. *Id.* Because the brain injuries were different ages, they were not the result of a single fall down the stairs. *Id.* at *9-10. According to Dr. Moutsios, had Ms. Watkins and the petitioner sought medical treatment for the victim prior to the seizure occurring June 15, 2007, the later seizure may have been prevented. *Id.* at *9.

In addition to brain injuries, the Care Team discovered that the victim suffered a fracture to his left arm bone near the wrist. *Id.* at *8. Dr. Moutsios described the fracture as a "'buckle fracture'" meaning "'there was some force that caused the outside layer of the bone to actually buckle.'" *Id.* Significant force would have caused the fracture and could have been the result of a "'twisting mechanism.'" The fracture had started to heal, and Dr. Moutsios estimated the victim's arm was broken one to two weeks before he was brought to the hospital on June 15, 2007. *Id.*

At the petitioner's trial, the State made reference to Ms. Watkins living in the "projects" and Mr. Watkins living "on the streets" in its opening statement. Trial counsel did not object. The State then called the following witnesses as part of its case-in-chief: Janell Driver, a paramedic with the Nashville Fire Department; Bryan Jones, a paramedic with the Nashville Fire Department; Falonda Tolston, a case manager for Child Protective Services; Detective Woodrow Ledford of the Metropolitan Nashville Police Department ("MNPD"); John Watkins, Lakeisha Watkins' father; Pamela Watkins, Lakeisha Watkins' mother; Detective Faye Okert of the MNPD; Dr. Lawrence Stack, an ER physician at Vanderbilt Hospital; Jessica Mitchell, Ms. Watkins' next door neighbor; Nicole Riley, the petitioner's cousin; Latoya Starks, a neighbor of Ms. Watkins; Dr. Sandra Moutsios, a pediatrician and internist at Vanderbilt Hospital; and Ms. Watkins. *Id.* at *1-12. In addition, the State played the petitioner's videotaped statement to police, and a video of the victim seizing. *Id.* at *5. The State then rested. *Id.* at *13.

The State made the following election of offenses at the close of its proof:

Count 1, the [petitioner] committed aggravated child abuse on or about April 16, 2007, by causing severe head injuries to the victim, including a concussion, inability to open eyes, and multiple facial bruises; count 2, the [petitioner] committed child neglect by failing to seek timely medical treatment for head injuries the victim sustained on April 16, 2007; count 3, the [petitioner] committed aggravated child abuse on or about June 15, 2007, by causing severe head injuries to the victim, including anoxic brain damage, acute subdural and subarachnoid hemorrhages, retinal

- 4 -

hemorrhages, and severe seizures; count 4, the appellant committed aggravated child neglect by neglecting the victim's welfare and failing to seek timely medical treatment for seizures the victim experienced on the morning of June 15, 2007, and his "decreased physical abilities throughout that day;" count 5, the appellant committed aggravated child neglect by neglecting the victim's welfare and failing to seek timely medical treatment for the seizures the victim experience on or about Wednesday, June 13, 2007; count 6, the appellant committed aggravated child abuse by causing a subdural hematoma and other brain trauma to the victim between May 29 and June 15, 2007; and count 7, the appellant committed aggravated child abuse by causing a fracture to the victim's left ulna between May 29 and June 15, 2007.

*Id.* at *7.

The petitioner declined to put on proof. Outside the presence of the jury, the trial court held a *Momon* hearing, where the petitioner confirmed his decision to waive his right to testify was voluntary. The jury convicted the appellant as charged.

The petitioner filed a direct appeal, and this Court reversed and dismissed one count each of aggravated child abuse (count 7), aggravated child neglect (count 5), and child neglect (count 2). *Id.* at *1-20. This Court affirmed three counts of aggravated child abuse (counts 1, 3, and 6), one count of aggravated child neglect (count 4), and the petitioner's sentence. *Id.* The Supreme Court denied the petitioner's application for appeal. *Id.* at *1.

### B. Post-Conviction Proceedings

After the conclusion of his direct appeal, the petitioner filed a timely pro se petition for post-conviction relief. The post-conviction court subsequently appointed counsel to represent the petitioner, and the petitioner filed an amended petition, arguing: trial counsel failed to provide the petitioner with sufficient representation to fully understand the nature and consequence of trial and sentencing hearing decisions; trial counsel failed to call the witnesses identified by the petitioner to testify on his behalf at trial; trial counsel failed to object or file a motion in limine to prevent the facts that Ms. Watkins lived in the "projects" and the petitioner lived "on the streets" from being presented with the evidence; and the cumulative effect of the inadequate representation required a new trial.

The post-conviction court subsequently held a hearing in which potential witness Richard Watts, trial counsel, and the petitioner testified. Mr. Watts testified that he is the

petitioner's brother and could have testified at trial but was not subpoenaed. According to Mr. Watts, had he been called as a witness, he would have testified that he was at Ms. Watkins' home on one of the days the alleged abuse occurred, and the child was happily playing and appeared healthy. He did not see anyone injure the child.

Mr. Watts testified that the petitioner had a good relationship with his teenaged daughter, and when he was not incarcerated, he spent every other weekend with her. To Mr. Watts' knowledge, the petitioner has never abused his daughter. Mr. Watts also testified that he has allowed the petitioner to be alone with his children and no abuse occurred. If Mr. Watts thought either Ms. Watkins or the petitioner abused the victim, he would have reported it to the authorities himself.

Trial counsel testified next. Trial counsel graduated from law school in 1975 and had handled over one-hundred jury trials over the course of his career. At the time he represented the petitioner, trial counsel had been employed by the public defender's office for approximately nine years.

Trial counsel admitted to being concerned the accomplice jury instruction adversely impacted his client's position. He also stated that he waited until the accomplice jury instruction had already been given to object. Trial counsel testified that the petitioner raised the accomplice jury instruction on direct appeal, and this Court found any error in the instruction was harmless.

Trial counsel admitted that during trial, he never objected to the references made by the State to the petitioner's and Ms. Watkins' living in a housing project. Instead, he questioned prospective jurors about this during voir dire by inquiring into whether the petitioner's poverty caused bias. Trial counsel admitted these references could have prejudiced his client.

Trial counsel met with the petitioner approximately thirty-seven times prior to trial. The petitioner gave him a list of thirteen potential witnesses during one of their meetings. Some of the witnesses had irrelevant information or raised questions of character that were not germane to the case. Many of the witnesses could not be located. Both trial counsel and his investigators spoke with several family members in an attempt to track down the missing witnesses, but it was not possible to find all thirteen. Ultimately, trial counsel decided not to subpoena any of the witnesses suggested by the petitioner.

The petitioner never mentioned his brother was in Ms. Watkins' home the morning of one of the incidents of abuse. Instead, when trial counsel and the petitioner discussed Mr. Watts, their conversations focused on using Mr. Watts to help find other

witnesses, and Mr. Watts agreed to assist. When discussing the petitioner, Mr. Watts never mentioned to trial counsel or the investigators that he was present in Ms. Watkins' home on one of the days the victim was injured.

Prior to trial, the State offered the petitioner a plea of eighteen years on the petitioner's choice of felony child abuse or felony child neglect. The petitioner insisted he was innocent and refused to consider accepting the plea offer. At the time the petitioner rejected the plea offer, trial counsel and the petitioner discussed the potential range of his sentence should the jury return a guilty verdict.

Trial counsel testified that he and the petitioner discussed the petitioner's potential testimony during their numerous meetings prior to trial. They discussed the subject of the proposed testimony, topics the petitioner should be prepared to address, things the petitioner should do while testifying, and things the petitioner should avoid while testifying. They also discussed the adverse consequences of testifying. Trial counsel felt some of the things the petitioner intended to say at trial would not be helpful to his case. For example, the petitioner wanted to testify regarding his good character. Trial counsel cautioned that by raising his character, the petitioner may open the door to questions from the State about his prior convictions for sexual battery and kidnapping.

During the break at the conclusion of the State's case-in-chief, trial counsel and the petitioner again discussed the petitioner's potential testimony. They discussed whether the testimony would be helpful given the fact the jury had already heard the redacted statement he gave to police. According to trial counsel, it was the petitioner's decision not to testify. During his *Momon* hearing, the trial judge confirmed the petitioner willingly waived his right to testify.

The petitioner was the final witness to testify during the post-conviction hearing. The petitioner complained his attorney did not fight for him. When he asked trial counsel about the thirteen witnesses, trial counsel simply said his investigators were on it, but he would never tell the petitioner what the investigators were doing or what they needed to locate the witnesses. The petitioner wanted a trial continuance because he felt they were not ready for trial. Trial counsel never gave him a step-by-step explanation of what they were going to do at trial or prepared him to testify. During their meetings, trial counsel would give up and simply walk away from the table.

The petitioner testified that he dropped out of school in the seventh or eighth grade. Due to his lack of education, the petitioner did not understand the "big words" used by his lawyer. He felt this was part of the reason his lawyer did not want him to testify. According to the petitioner, sometimes "how I talk it might not come out right," so his lawyer thought he would say something detrimental in front of the jury.

The petitioner wanted to testify so the jury would hear his story. He was present at the home where the child was injured but innocent of the abuse and neglect charges. He also wanted to tell the jury that he is not an abusive person, but trial counsel told him that testimony would open the door to his prior convictions. Eventually, after the trial went forward and his witnesses were not subpoenaed, he "was like forget it" and signed the waiver form. When questioned by the trial judge as to his statement at trial that he willingly signed the waiver, the petitioner said he lied. According to the petitioner, trial counsel decided he would not testify.

The petitioner testified the statement he gave police was true and admitted that the jury heard a redacted version of that statement at trial. According to the petitioner, had he been called as a witness, his testimony would have been similar to the redacted statement. In addition, the petitioner would have asserted his innocence, answered the State's questions, and told the jury he is not an abusive person.

The State did not present any evidence at the post-conviction hearing. The post-conviction court took the matter under advisement and subsequently denied the petition. With respect to the petitioner's assertion that he did not willingly waive his right to testify, the post-conviction court found:

> Not only does the Court's colloquy with [the] [p]etitioner regarding his right to testify bely [the] [p]etitioner's evidentiary hearing testimony, but [t]rial [c]ounsel testified he had discussed with [the] [p]etitioner his right to testify on several occasions prior to going over the waiver paperwork at trial. Trial [c]ounsel stated he discussed with [the] [p]etitioner the pros and cons of testifying as well as the fact that some information [the] [p]etitioner wished to introduce to the jury could only come into evidence through [the] [p]etitioner's own testimony. According to [t]rial [c]ounsel, [the] [p]etitioner ultimately made the decision not to testify. The Court finds [t]rial [c]ounsel's testimony credible.

> Further, [the] [p]etitioner was able to present his version of events through his police statement that was played for the jury. As reflected during the post-conviction hearing, [the] [p]etitioner had no additional substantive additions to this initial statement. [The] [p]etitioner has failed to demonstrate by clear and convincing evidence that [t]rial [c]ounsel was ineffective nor has [the] [p]etitioner established he was prejudiced by any alleged deficiency. The post-conviction petition is denied as to this issue.

With respect to the petitioner's assertion that trial counsel was deficient in failing to call any of the thirteen witnesses identified by the petitioner, the post-conviction court found that "[t]rial [c]ounsel found their proposed testimony 'not wholly relevant' or related to character issues inappropriate to the case," so "[t]rial [c]ounsel made a strategic decision not to call these proposed witnesses." The post-conviction court further found trial counsel's testimony that the petitioner and Mr. Watts never indicated to trial counsel or his investigators that Mr. Watts was present one of the days of the abuse to be credible. Accordingly, the post-conviction ruled that the petitioner "failed to meet his burden by clear and convincing evidence that [t]rial [c]ounsel failed to interview or call necessary witnesses nor has [the] [p]etitioner established prejudice; the petition is denied as to this issue." The post-conviction court additionally found the petitioner failed to present the additional witnesses he contends should have testified at the evidentiary hearing, so he failed to establish by clear and convincing evidence that trial counsel was ineffective by not calling them.

The post-conviction court next found the petitioner did not cite any case law in support of his position that trial counsel was ineffective by failing to object to the reference to Ms. Mitchell and the petitioner living in the "projects" and "on the streets." In denying relief on this claim, the post-conviction court found the petitioner did not establish deficient performance as to this issue by clear and convincing evidence nor did he establish how he was prejudiced by counsel's decision not to object. Finally, the post-conviction court denied the petitioner's request for a new trial based on the cumulative effect of trial counsel's alleged ineffective assistance of counsel.

After the post-conviction court denied the petitioner's request for post-conviction relief, this timely appeal followed. On appeal, the petitioner again argues trial counsel provided ineffective assistance by failing to call the petitioner as a witness at trial, failing to subpoena the thirteen witnesses identified by the petitioner to testify at trial, failing to object to the co-conspirator jury instruction, and failing to object to the references to Ms. Watkins living in the "projects" and the defendant "living on the streets." Due to the cumulative effect of these errors, the defendant asserts he is entitled to a new trial. The State argues trial counsel exercised reasonable judgment and provided adequate assistance in all significant decisions. We agree with the State and affirm the judgment of the post-conviction court.

*Analysis*

To obtain relief in a post-conviction proceeding, a petitioner must demonstrate that his or her "conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. The post-conviction petitioner bears the burden

of proving his allegations of fact by clear and convincing evidence. *See* Tenn. Code Ann. § 40-30-110(f). "'Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *Lane v. State*, 316 S.W.3d 555, 562 (Tenn. 2010) (quoting *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009)).

Appellate courts do not reassess the trial court's determination of the credibility of witnesses. *Dellinger v. State*, 279 S.W.3d 282, 292 (Tenn. 2009) (citing *R.D.S. v. State*, 245 S.W.3d 356, 362 (Tenn. 2008)). Assessing the credibility of witnesses is a matter entrusted to the trial judge as the trier of fact. *R.D.S.*, 245 S.W.3d at 362 (quoting *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996)). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. *See Tidwell v. State*, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence. *See Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a trial court's application of the law to the facts of the case is de novo, with no presumption of correctness. *See Ruff v. State*, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed de novo, with a presumption of correctness given only to the post-conviction court's findings of fact. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001); *Burns v. State*, 6 S.W.3d 453, 461 (Tenn. 1999).

The Sixth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, and article I, section 9 of the Tennessee Constitution both require that criminal defendants receive effective assistance of counsel. *Cauthern v. State*, 145 S.W.3d 571, 598 (Tenn. Crim. App. 2004) (citation omitted). When a petitioner claims he received ineffective assistance of counsel, he has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. *Strickland v. Washington,* 466 U.S. 668, 687 (1984); *see State v. Taylor,* 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the same standard for determining ineffective assistance of counsel applied in federal cases also applies in Tennessee). The *Strickland* standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad v. State,* 938 S.W.2d 363, 369 (Tenn. 1996) (citing *Strickland,* 466 U.S. at 688; *Baxter v. Rose,* 523 S.W.2d 930, 936 (Tenn. 1975)). With regard to the standard, our Supreme Court has held:

> [T]he assistance of counsel required under the Sixth Amendment is counsel reasonably likely to render and rendering reasonably effective assistance. It is a violation of this standard for defense counsel to deprive a criminal defendant of a substantial defense by his own ineffectiveness or incompetence . . . Defense counsel must perform at least as well as a lawyer with ordinary training and skill in the criminal law and must conscientiously protect his client's interest, undeflected by conflicting considerations.

*Finch v. State*, 226 S.W.3d 307, 315-16 (Tenn. 2007) (quoting *Baxter*, 523 S.W.2d at 934-35).

When reviewing trial counsel's performance, this Court "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." *Howell v. State*, 185 S.W.3d 319, 326 (Tenn. 2006) (citing *Strickland*, 466 U.S. at 689). The fact that a trial strategy or tactic failed or was detrimental to the defense does not, alone, support a claim for ineffective assistance of counsel. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). Deference is given to sound tactical decisions made after adequate preparation for the case. *Id.*

To satisfy the prejudice prong of the test, the petitioner "must establish a reasonable probability that but for counsel's errors the result of the proceeding would have been different." *Vaughn v. State*, 202 S.W.3d 106, 116 (Tenn. 2006) (citing *Strickland*, 466 U.S. at 694). "A 'reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.* (quoting *Strickland,* 466 U.S. at 694). In order to prevail, the deficient performance must have been of such magnitude that the petitioner was deprived of a fair trial and that the reliability of the outcome was called into question. *Finch*, 226 S.W.3d at 316.

Courts need not approach the *Strickland* test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697; *see also Goad,* 938 S.W.2d at 370 (stating that "failure to prove either

deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

### A.     Right to Testify

The petitioner contends trial counsel was ineffective by failing to adequately prepare him to testify at trial, instead advising him to waive his right to testify. Trial counsel testified at the post-conviction hearing that he met with the petitioner approximately thirty-seven times prior to trial. During these meetings, trial counsel and the petitioner discussed potential witnesses, the petitioner's proposed testimony, and the potential negative consequences of the petitioner's proposed testimony, including the possibility his prior criminal record might be used against him. Trial counsel also expressed concerns regarding the relevance and helpfulness of some of the petitioner's proposed testimony. Trial counsel and the petitioner again discussed the petitioner's testimony at the close of the State's proof. According to trial counsel, following these discussions, the petitioner decided not to testify. Despite later arguing he lied, the petitioner confirmed at his *Momon* hearing that he understood his rights, and it was his decision not to testify. The post-conviction court found trial counsel's testimony regarding his trial preparation, discussions with the petitioner, and the petitioner's decision not to testify to be credible. Giving deference to trial counsel's trial strategy, the petitioner has failed to show trial counsel was deficient in preparing him for trial, including his advice regarding testimony. The petitioner is not entitled to relief on this issue.

Interwoven with his claim that trial counsel failed to adequately advise him concerning his right to testify, the petitioner claims trial counsel was ineffective in failing to explain the accomplice jury instruction to him. The petitioner, claiming the accomplice jury instruction "removed to a significant degree, the State's burden of proof since the jury was essentially instructed as a matter of fact by the Judge prior to deliberation that the child in this case was in fact abused and/or neglected," contends he would have testified if he had been fully informed about the instruction. However, this Court addressed the impact of the accomplice instruction on the State's burden of proof on direct appeal and determined that, contrary to the petitioner's claim, the "trial court's instruction held the State to a higher burden, requiring the jury to find that [the accomplice's] testimony was corroborated. *Watts*, 2012 WL 1591730 at *16.

Additionally, even if trial counsel was deficient in failing to adequately advise the petitioner concerning the accomplice instruction, the petitioner failed to show how he was prejudiced by trial counsel's actions. As noted by the post-conviction court, the petitioner "was able to present his version of events through his police statement that was played for the jury," and the petitioner "had no additional substantive additions to this

- 12 -

initial statement." Furthermore, the post-conviction court accredited the testimony of trial counsel concerning the numerous discussions he had with the petitioner concerning his right to testify, including his concern that the petitioner would open the door to questioning about his prior convictions for sexual battery and kidnapping should he testify. The petitioner is not entitled to relief on this claim.

## B. Calling Witnesses

The petitioner has likewise not shown trial counsel provided ineffective representation by failing to subpoena the thirteen alleged witnesses suggested by the petitioner. The petitioner only called one of the alleged witnesses at his post-conviction hearing – Richard Watts. According to Mr. Watts, had the petitioner called him as a witness at trial, he would have testified that he was in Ms. Watkins' home on one of the dates of abuse, and the victim was seemingly healthy and happily playing. In addition, he would have testified that the petitioner frequently spent time with his own daughter, as well as Mr. Watts' children, and never harmed them. Trial counsel testified that he had been in contact with Mr. Watts prior to trial, and Mr. Watts only provided assistance with locating witnesses. Neither Mr. Watts nor the petitioner advised trial counsel that Mr. Watts had been in the home on one of the dates of abuse.

Trial counsel's conduct must be evaluated from his perspective at the time he decided not to call Mr. Watts has a witness. Trial counsel offered detailed testimony regarding the steps he took to prepare for trial, and during his investigation, he never learned that Mr. Watts had been present on one of the dates of abuse. The post-conviction court accredited the testimony of trial counsel, and we will not reweigh or reevaluate this evidence on appeal. Giving deference to trial counsel's tactical decision not to call Mr. Watts as a witness, the petitioner has not established trial counsel was deficient in this regard. The petitioner is not entitled to relief on this issue.

In addition, the petitioner failed to call the remaining twelve witnesses to testify at his post-conviction hearing. When a petitioner contends trial counsel failed to discover, interview, or present witnesses in support of his defense, the petitioner must call those witnesses to testify at an evidentiary hearing. *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). This is the only way the petitioner can establish:

> that (a) a material witness existed and the witness could have been discovered but for counsel's neglect in his investigation of the case, (b) a known witness was not interviewed, (c) the failure to discover or interview a witness inured to his prejudice, or (d) the failure to have a known witness present or call the witness to the stand resulted in the denial of critical evidence which inured to the prejudice of the petitioner.

*Id.* Even if a petitioner is able to show counsel was deficient in the investigation of the facts or calling a known witness, the petitioner is not entitled to post-conviction relief unless he produces a material witness at his post-conviction evidentiary hearing who "(a) could have been found by a reasonable investigation and (b) would have testified favorably in support of his defense if called." *Id.* at 758. Without doing this, the petitioner cannot establish the prejudice requirement of the two-prong *Strickland* test. *Id.*

In the present matter, the petitioner has not shown he was prejudiced by trial counsel's decision not to subpoena the remaining twelve witnesses. The petitioner did not present those witnesses at his post-conviction evidentiary hearing, and we will not speculate as to what those witnesses would have said if called to testify at trial. *See Black*, 794 S.W.2d at 757. The petitioner is not entitled to relief on this issue.

### C. Motion in Limine

The petitioner next argues trial counsel provided ineffective assistance by failing to file a motion in limine to exclude reference to the facts Ms. Watkins lived in the "projects" and the petitioner "lived on the streets." We disagree. Trial counsel testified that rather than filing a motion in limine, he questioned potential jurors during voir dire regarding potential bias caused by the petitioner's economic status. This was a strategic decision made after what the record reflects was adequate preparation for trial.

This Court must be highly deferential to counsel's performance, *Burns,* 6 S.W.3d at 462. We will not grant the petitioner the benefit of hindsight by second-guessing reasonably based trial strategy. *See Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). Moreover, "[t]he fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation." *Goad,* 938 S.W.2d at 369. Again giving deference to trial counsel's strategy, the petitioner has failed to show counsel was deficient by failing to exclude references to the "projects" and "living on the streets" prior to trial. Accordingly, he is not entitled to relief on this issue.

### D. Cumulative Error

The petitioner argues the cumulative effect of trial counsel's inadequate representation requires a new trial. The cumulative error doctrine recognizes that there may be many errors committed in trial proceedings, each of which constitutes mere harmless error in isolation, but "have a cumulative effect on the proceedings as great as to require reversal in order to preserve a defendant's right to a fair trial." *State v. Hester,* 324 S.W.3d 1, 76 (Tenn. 2010). When considering cumulative error, this Court may look to the case as a whole, the numbers of errors committed, their interrelationship and

combined effect, and the strength of the State's case. *Id.* (quoting *United States v. Sepulveda,* 15 F.3d 1161, 1196 (1st Cir. 1993)). In this case, the petitioner failed to carry his burden of showing trial counsel deviated from the required standard of assistance. Accordingly, the petitioner has not established that the cumulative effect of trial counsel's errors resulted in prejudice. The petitioner's claim is without merit.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
J. ROSS DYER, JUDGE